1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
                              AT SEATTLE
9

10   FRANK SULLIVAN,                        CASE NO. C13-0803JLR

11                   Plaintiff,             ORDER GRANTING
                                            DEFENDANTS' MOTION FOR
12            v.                            SUMMARY JUDGMENT

13   CITY OF MARYSVILLE, et al.,

14                   Defendants.

15   BEN DAVIS and RACHEL DAVIS,

16                   Third-Party Plaintiffs,

17            v.

18   ROGER HAWKES, et al.,

19                   Third-Party Defendants.

20                      I.    INTRODUCTION

21        This matter comes before the court on Defendants Chris Jones, Billy Xiong, and

22   the City of Marysville's motion for qualified immunity and summary judgment. (*See*

ORDER- 1

1  Mot. (Dkt. # 46).)  This case arises from a dispute over the estate of Plaintiff Frank

2  Sullivan's partner, Jennifer Davis.  Officers Jones and Xiong, police officers employed

3  by the City of Marysville ("Marysville"), responded to the scene of numerous altercations

4  arising from this dispute.  Mr. Sullivan brings claims against the police for their

5  involvement in these altercations.  Having considered the submissions of the parties, the

6  balance of the record, and the relevant law, and no party having requested oral argument,

7  the court GRANTS Defendants' motion for qualified immunity and summary judgment.

8  ## II.   BACKGROUND

9          Unless otherwise noted, the following facts are undisputed.  Frank Sullivan and

10  Jennifer Davis met on a cruise in 2008.  (Needle Decl. (Dkt. # 51-1) Ex. A ("Sullivan

11  Dep.") at 8.)[1]  Mr. Sullivan subsequently moved from Rhode Island to be near Ms. Davis

12  in Washington.  (*Id.* at 9.)  He brought along furniture and other personal items.  (*Id.* 60-

13  62.)  Mr. Sullivan and Ms. Davis moved into a house in Marysville together in 2011.  (*Id.*

14  at 4.)  The house was titled in Ms. Davis' name only.  (Sullivan Decl. (Dkt. # 23) ¶ 5.)

15  Mr. Sullivan, however, contributed to the down payment on the house, as well as to the

16  monthly payments.  (*Id.* ¶ 4.)  The two were not married.  (*Id.* ¶ 2; Sullivan Dep. at 58.)

17          Ms. Davis died on August 8, 2012.  (Sullivan Decl. ¶ 5.)  In her last will and

18  testament, Ms. Davis appointed her friend Janet Brown as her personal representative.

19  (Ragonesi Decl. (Dkt. # 47) Ex. 3 ("Will") at 20.)  On August 16, 2012, Snohomish

20

21          [1] According to the court's usual practice, pinpoint citations to deposition transcripts refer not to
22  the page numbers as labeled on the deposition transcripts themselves, but to the page numbers as labeled
in the court's CM/ECF docket page-numbering system.

ORDER- 2

County Superior Court entered an order probating the will, appointing Ms. Brown as personal representative, and confirming nonintervention powers.  (Ragonesi Decl. Ex. 1 ("Nonintervention Order").)  The court order states:  "Upon filing an oath, the petitioner as personal representative may administer and close the estate without further intervention of court."  (*Id.* ¶ 3.5.)  The court order further provides:  "Upon qualifying, the petitioner as personal representative is authorized to transfer all property of the estate without further order of the court."  (*Id.* ¶ 3.7.)  Ms. Davis submitted the requisite oath that same day.  (*See* Ragonesi Decl. Ex. 4 ("Oath").)  Accordingly, the Snohomish County Superior Court granted Ms. Brown letters testamentary authorizing her to execute the will.  (Ragonesi Decl. Ex. 5 ("Testamentary Letters").)

In her will, Ms. Davis left her entire estate to her two sons and a grandchild.  (Will at 17-18.)  She did not leave anything to Mr. Sullivan.  (*See id.*)  Nonetheless, Mr. Sullivan continued to live in the Marysville residence after her death.  (Sullivan Decl. ¶ 5.)

**A.     August 19, 2012**

Mr. Sullivan arranged a memorial service for Ms. Davis to be held at the Marysville property on August 19, 2012.  (Sullivan Dep. at 12.)  Mr. Sullivan estimates that 20-30 of Ms. Davis' relatives, friends, and co-workers attended the service.  (*Id.*)  He did not invite Ms. Brown or Ms. Davis' children to the service.  (*Id.* at 13.)

Nevertheless, Ms. Brown and Ms. Davis' son, Ben Davis, arrived at the Marysville property during the service and entered the house.  (*Id.* at 15.)  Mr. Sullivan informed them that they were not invited, but they refused to leave.  (*Id.*)  At this point,

1  there was "a lot of screaming and yelling for them to get out" by the other guests, who

2  "were upset." (*Id.* at 17.)  Mr. Sullivan called 911 in an attempt to have Ms. Brown

3  removed from the premises.  (*Id.* at 28; *see also* Ragonesi Decl. Ex. 6 ("Police Rep.") at

4  30.)

5         Officers Chris Jones and Billy Xiong responded to Mr. Sullivan's call.  (*Id.*)  Ms.

6  Brown and Mr. Davis retreated to the lawn.  (Sullivan Dep. at 17.)  The officers spoke

7  with both parties separately.  (*Id.* at 17-19.)  Ms. Brown showed Officer Jones a notarized

8  copy of the will, as well as a court order recognizing her as the executor of Ms. Sullivan's

9  will—documents that he recognized as giving Ms. Brown "the authority to control the

10 property, belongings, and real estate, etc., of the estate."  (Ragonesi Decl. Ex. 7 ("Jones

11 Rep.") at 44.)  Ms. Brown explained that she was on a tight time frame to administer the

12 estate so she could return to her family and job in Kansas.  (*Id.* at 45; *see also* Sullivan

13 Dep. at 31.)  Ms. Brown indicated that she wanted to photograph the estate and to secure

14 an office belonging to Ms. Davis.  (Jones Rep. at 44.)

15        The officers explained to Mr. Sullivan that Ms. Brown possessed court paperwork

16 authorizing her to administer the estate.  (Sullivan Dep. at 21; *see also* Ragonesi Decl.

17 Ex. 9 ("Xiong Dep.") at 56-57.)  Mr. Sullivan still refused to allow Ms. Brown and Mr.

18 Davis to enter the house.  (Sullivan Dep. at 22-23.)  Mr. Sullivan claims that one of the

19

20

21

22

1  officers told him that he would be arrested if he did not let Ms. Brown and Mr. Davis into
2  the house.[2]  (*Id.* at 22.)

3       Notwithstanding Mr. Sullivan's objections, the police officers escorted Ms. Brown
4  and Mr. Davis into the house and accompanied them from room to room.  (*Id.* at 24.)
5  When they entered the house, Mr. Sullivan recalls:  "My guests basically attacked them.
6  They were yelling and screaming, and she was yelling and screaming at them . . . ."  (*Id.*
7  at 23-24.)  He concedes that the police "had to" escort Ms. Brown and Mr. Davis into the
8  house because "[t]here would have been mayhem if they didn't."  (*Id.* at 24.)

9       According to Mr. Sullivan, Ms. Brown and Mr. Davis and the police officers
10 remained in the house for about 10 minutes.  (*Id.* at 24.)  During that time, Ms. Brown
11 took pictures to document the state of the property.  (*Id.* at 25.)  Mr. Sullivan also claims
12 that Mr. Davis changed the locks on the door of his mother's study.  (*Id.* at 25.)

13 **B.   August 20, 2012**

14      The following day, Ms. Brown, Mr. Davis, and a friend returned to the Marysville
15 property with a moving truck.  (*Id.* at 26.)  Mr. Sullivan claims that they arrived at 9:00
16 a.m., he refused them entry, and he called the police.[3]  (*Id.* at 27.)  Officers Chris Jones

17

18 _____

19      [2] Both officers deny threatening to arrest anyone.  (*See* Mot. at 5.)  In considering Mr. Sullivan's
20 summary judgment motion, however, the court must construe factual disputes in his favor.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

21      [3] Computer aided dispatch reports show that Mr. Davis first called the police at 4:10 p.m. and that
   Mr. Sullivan called the police at 4:24 p.m.  (Police Rep. at 32-33.)  Mr. Sullivan concedes that he was
22 "quite confused" that day, because his partner had recently died.  (Sullivan Dep. at 27.)  This discrepancy,
   however, is immaterial to the question of the officers' liability.

1    and Billy Xiong again responded to the call.  (Police Rep. at 32.)  Mr. Sullivan also called

2    his realtor, Ms. Nemeth, to the scene.  (Needle Decl. Ex. B ("Nemeth Dep. II") at 77.)

3          The officers spoke with Ms. Brown and Mr. Davis on the lawn and reviewed the

4    court documents she had brought.  (Sullivan Dep. at 28-29, 31; Jones Rep. at 45.)  The

5    officers then informed Mr. Sullivan that Ms. Brown had paperwork authorizing her to

6    administer the estate, and that, pursuant to the court order, he needed to admit her to the

7    house and permit her to remove items.  (Sullivan Dep. at 29-30; Jones Rep. at 45.)  Mr.

8    Sullivan refused.  (Ragonesi Decl. Ex. 12 ("Nemeth Dep.") at 99-100.)  Mr. Sullivan

9    again claims that the officers threatened to take him to jail if he did not comply.

10   (Sullivan Dep. at 28-29.)  Ms. Nemeth recalls an officer stating:  "[T]his needs to be

11   resolved today, Frank, or we're going to take somebody to jail."  (Nemeth Dep. at 100.)

12   The officers informed Ms. Nemeth that Ms. Brown had "an order authorizing her to take

13   control of the house and the possessions of the house."  (*Id.*)  The officers reassured Mr.

14   Sullivan, however, that he was not being evicted.  (*Id.* at 101; Jones Rep. at 45.)

15         Mr. Sullivan relented.  He clarified that "he didn't want to keep Jennifer's things

16   from her kids.  He just didn't want Janet in the house . . . ."  (Nemeth Dep. at 102; *see*

17   *also* Jones Rep. at 45.)  The officers brokered a compromise:  Mr. Sullivan would permit

18   Mr. Davis and the friend to enter the house and gather items as long as Ms. Brown

19   remained outside.  (Sullivan Dep. at 32-33; *see also* Jones Rep. at 45.)  Mr. Sullivan

20   claims that he agreed to this deal because he did not want to go to jail.  (Sullivan Dep. at

21   32-33.)

22

1    Ms. Nemeth further suggested that if there was a dispute as to the ownership of an

2    item, it should remain on the property to be dealt with later by the party's attorneys.

3    (Nemeth Dep. at 102.)  She recalls that "somebody agreed to that."  (*Id.*)  Ms. Nemeth

4    also requested that the police officers remain and monitor the proceedings in order to

5    resolve disputes over which possessions should be removed.  (Nemeth Dep. at 101-02.)

6    The officers declined to become further involved, and left the scene without further

7    altercation.  (*Id.* at 102; *see also* Jones Rep. at 47.)  The officers had been present at the

8    property for approximately 30 minutes.  (*See* Police Rep. at 33.)

9    After the officers left, Mr. Davis and the friend began moving items, taking

10   pictures of the items, and documenting them in a list.  (Nemeth Dep. II at 77; Sullivan

11   Dep. at 58.)  Later, in contravention of the parties' agreement, Ms. Brown entered the

12   house.  (Sullivan Dep. at 58.)  Mr. Davis testifies that he only removed items that he was

13   certain had belonged to his mother.  (Needle Decl. Ex. G ("Davis Dep.") at 168-69.)

14   Although Mr. Davis at times attempted to inquire whether particular items belonged to

15   Mr. Sullivan, Mr. Sullivan was largely non-responsive.  (*Id.* at 170-73.)  On at least one

16   occasion, however, Mr. Sullivan protested that Mr. Davis was removing an item that

17   belonged jointly to Mr. Sullivan and Ms. Davis.  (Nemeth Dep. II at 77.)  Mr. Davis

18   allegedly bullied Mr. Sullivan, and Ms. Nemeth counseled Mr. Sullivan to permit the

19   item to be removed.  (*Id.*)

20   Mr. Sullivan placed another call to the police later that night, around 8:00 p.m.

21   (Sullivan Dep. at 34-37; Police Rep. at 34.)  There had been another altercation between

22   Mr. Davis and Mr. Sullivan:  Mr. Davis had grown demonstrably angry when he

ORDER- 7

1   discovered copies of the court probate documents on Mr. Sullivan's table.  (Sullivan Dep.

2   at 34-37.)  Officer Xiong and another police officer responded to the scene.  (*See* Police

3   Rep. at 34.)  They remained at the house for less than 15 minutes—long enough to

4   establish that Ms. Brown was the executor of the estate and to caution the parties against

5   continuing to involve the police in their civil dispute.  (*See* Police Rep. at 34; Sullivan

6   Dep. at 36-37.)

7   **C.      January 22, 2013**

8          On January 22, 2013, Mr. Sullivan returned to the Marysville property to find that

9   the locks on the property had been changed and he was locked out.  (Sullivan Dep. at 47.)

10  He called the police, and two different Marysville police officers (Officer Lutschg and

11  Officer Vermeulen) arrived.  (*Id.* at 50.)  One officer went to talk to Ms. Brown and Mr.

12  Davis, who were inside the house.  (*Id.*at 51.)  When the officer returned, Mr. Sullivan

13  requested that the police remove Ms. Brown and Mr. Davis from the house and arrest

14  them.  (*Id.* at 52; *see also* Needle Decl. Ex. E ("Lutschg Dep.") at 148-51; Needle Decl.

15  Ex. F ("Vermeulen Dep.") at 160-63.)  The officers declined to arrest Ms. Brown and Mr.

16  Davis and told Mr. Sullivan that Ms. Brown had shown them court paperwork that

17  authorized her to possess the residence.  (Sullivan Dep. at 51-52; Lutschg Dep. at 148-

18  151; Vermeulen Dep. at 160-63.)  The officers stated that they understood Mr. Sullivan

19  had been living in the house and that they would not arrest him if he attempted to break

20  back into the house.  (Sullivan Dep. at 52; Lutschg Dep. at 148-151; Vermeulen Dep. at

21  160-163.)  Mr. Sullivan claims that the officers also cautioned that, if his attempts to

22  break in caused a fight or a commotion, the police would have to arrest someone.

1    (Sullivan Dep. at 52.)  After learning that the police would not reinstate him into the

2    Marysville residence, Mr. Sullivan took refuge in a neighbor's house.  (Sullivan Dep. at

3    53.)

4    **D.   This Lawsuit**

5        Mr. Sullivan now brings claims against Officers Xiong and Jones under 42 U.S.C.

6    § 1983 for unreasonable search and seizure in contravention of the Fourth Amendment

7    and for violation of his substantive due process rights under the 14th Amendment.  (*See*

8    *generally* Am. Compl. (Dkt. # 34) ¶¶ 5.2-5.4.)  Mr. Sullivan also brings state law claims

9    for invasion of privacy and conversion against Officers Xiong and Jones, as well as

10   against Marysville under a theory of respondeat superior.  (*Id.* ¶¶ 5.5-5.7.)  The officers

11   now bring a motion for qualified judgment with respect to the constitutional claims, and

12   Marysville and the officers move for summary judgment with respect to the state law

13   claims.  (*See generally* Mot.)

14                     **III.     ANALYSIS**

15   **A.   Summary Judgment Standard**

16       Federal Rule of Civil Procedure 56 permits a court to grant summary judgment

17   where the moving party demonstrates (1) the absence of a genuine issue of material fact

18   and (2) entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S.

19   317, 322 (1986); *see also Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  The

20   moving party bears the initial burden of production of showing an absence of a genuine

21   issue of material fact.  *Celotex*, 477 U.S. at 323.

22

1    If the moving party does not bear the ultimate burden of persuasion at trial, it can

2    show an absence of issue of material fact in one of two ways:  (1) by producing evidence

3    negating an essential element of the nonmoving party's case, or, (2) showing that the

4    nonmoving party lacks evidence of an essential element of its claim or defense.  *Nissan*

5    *Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000).

6    If the moving party meets its burden of production, the burden then shifts to the non-

7    moving party to designate specific facts demonstrating the existence of genuine issues for

8    trial.  *Celotex*, 477 U.S. at 324.  The non-moving party "may not rest upon the mere

9    allegations or denials of the [nonmoving] party's pleading," but must provide affidavits

10   or other sources of evidence that "set forth specific facts showing that there is a genuine

11   issue for trial" from which a factfinder could reasonably find in the non-moving party's

12   favor.  Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

13   In determining whether the factfinder could reasonably find in the non-moving party's

14   favor, "the court must draw all reasonable inferences in favor of the nonmoving party."

15   *Reeves*, 530 U.S. at 150.

16   **B.    Washington Estate Law**

17   It is undisputed that on August 16, 2012, Snohomish County Superior Court

18   entered an order probating Ms. Davis' will, appointing Ms. Brown as personal

19   representative, and confirming nonintervention powers.  (Ragonesi Decl. Ex. 1

20   ("Nonintervention Order").)  Under Washington state law:  "Every personal

21   representative shall . . . have a right to the immediate possession of all the real as well as

22   personal estate of the deceased . . . and shall keep in tenantable repair all houses,

1  buildings and fixtures thereon, which are under his or her control." RCW 11.48.020.

2  The Washington Supreme Court has long recognized the right of the personal

3  representative to possess and control the estate's real and personal property until the

4  estate is settled. *See, e.g.*, *In re Estate of Jones*, 93 P.3d 147, 153-54 (Wash. 2004) ("An

5  executor is entitled to possess and control estate property during the administration of the

6  estate and has a right to it even against other heirs.") (citing RCW 11.48.020); *In re*

7  *Hickman's Estate*, 250 P.2d 524, 530 (Wash. 1952);  *Bishop v. Locke*, 158 P. 997, 998

8  (Wash. 1916); *In re Boston's Estate*, 491 P.2d 1033, 1034 (Wash. 1971).

9          Additionally, a personal representative granted nonintervention powers may

10  administer the estate without further court orders:  "Any personal representative acting

11  under nonintervention powers may . . . mortgage, encumber, lease, sell, exchange,

12  convey, and otherwise have the same powers . . . that a trustee has . . . with regard to the

13  assets of the estate, both real and personal, all without an order of court and without

14  notice, approval, or confirmation, and in all other respects administer and settle the estate

15  of the decedent without intervention of court."  RCW 11.68.090.  Typical actions of a

16  personal representative "involve locating and taking control of assets, preparing an

17  inventory, and protecting the assets of the estate."  26B Wash. Prac., Probate Law and

18  Practice § 3.36.  "It shall be the duty of every personal representative to settle the

19  estate . . . in his or her hands as rapidly and as quickly as possible, without sacrifice to the

20  probate or nonprobate estate."  RCW 11.48.010.  In general, the personal representative is

21  responsible for safekeeping the estate property, and is "responsible for loss or decrease or

22

1    destruction of any of the property or effects of the estate, without his or her fault."  RCW

2    11.48.030.

3          Because Mr. Sullivan does not contest that Ms. Brown was duly appointed the

4    personal representative of Ms. Davis' estate and that the Snohomish County Superior

5    Court granted her nonintervention powers, these statutes govern her rights and duties

6    towards the estate's property.  (*See* Nonintervention Order; Oath; Letters Testamentary.)

7    **C.    Section 1983 Claims**

8          With respect to Mr. Sullivan's claims under § 1983, the court finds that Officers

9    Xiong and Jones have qualified immunity for the actions they took on August 19 and

10   August 20, 2012.  Because Mr. Sullivan has not named any other officers as parties to the

11   suit, and because Section 1983 actions are ordinarily not maintainable against municipal

12   entities such as Marysville,[4] the court does not address Mr. Sullivan's allegations

13   concerning the actions of other Marysville police officers on other dates.

14        **1.   Qualified Immunity Standard**

15        In the context of § 1983 claims, "[t]he doctrine of qualified immunity protects

16   government officials 'from liability for civil damages insofar as their conduct does not

17   violate clearly established statutory or constitutional rights of which a reasonable person

18   would have known.'"  *Stanton v. Sims,* 571 U.S. ----, 134 S.Ct. 3, 4-5 (2013) (per curiam)

19   (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  "Qualified immunity gives

20   _____

21        [4] Although *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) sets forth
     certain circumstances in which § 1983 claims arise against municipalities, Mr. Sullivan does not bring a
22   claim under *Monell*.  *See Delia v. City of Rialto*, 621 F.3d 1069, 1081 (9th Cir. 2010).

1   government officials breathing room to make reasonable but mistaken judgments," and

2   "protects all but the plainly incompetent or those who knowingly violate the law."

3   *Ashcroft v. al-Kidd*, 563 U.S. ----, 131 S.Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*,

4   475 U.S. 335, 341 (1986)).  Accordingly, an officer will be denied qualified immunity in

5   a § 1983 action "only if (1) the facts alleged, taken in the light most favorable to the party

6   asserting injury, show that the officer's conduct violated a constitutional right, and (2) the

7   right at issue was clearly established at the time of the incident such that a reasonable

8   officer would have understood her conduct to be unlawful in that situation."  *Green v.*

9   *City & Cnty. of San Fran.*, ---F.3d.---, 2014 WL 1876273, at *11 (9th Cir. May 12, 2014)

10  (quoting *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011)).  Courts have

11  discretion to decide the order in which to address the two prongs.  *Pearson*, 555 U.S. at

12  242.

13          Regarding the second prong, the plaintiff bears the "burden of demonstrating that

14  the right allegedly violated was clearly established at the time of the incident."  *Greene v.*

15  *Camreta*, 588 F.3d 1011, 1031 (9th Cir. 2009).  A government official's conduct violates

16  clearly established law when, "at the time of the challenged conduct, the contours of a

17  right are sufficiently clear that every reasonable official would have understood that what

18  he is doing violates that right."  *al-Kidd*, 131 S. Ct. at 2083.  The inquiry, therefore,

19  implicates two determinations:  (1) whether the law governing the conduct at issue was

20  clearly established and (2) whether the facts as alleged could support a reasonable belief

21  that the conduct in question conformed to the established law.  *Act Up!/Portland v.*

22  *Bagley*, 988 F.2d 868, 873 (9th Cir. 1993).  Both determinations are questions of law to

1  be determined by the court in the absence of genuine issues of material fact.  *Green*, 2014

2  WL 1876273, at *11 (citing *Act Up!/Portland*, 988 F.2d at 873).

3         Each determination "must be undertaken in light of the specific context of the

4  case, not as a broad general proposition."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

5  Courts "do not require a case directly on point" before concluding that the law is clearly

6  established, "but existing precedent must have placed the statutory or constitutional

7  question beyond debate."  *al–Kidd*, 131 S.Ct. at 2083.  Qualified immunity is an objective

8  inquiry; therefore, officers' subjective beliefs regarding their actions are irrelevant.

9  *Torres*, 548 F.3d at 1211 (citing *Grant v. City of Long Beach*, 315 F.3d 1081, 1089 (9th

10 Cir. 2002)).

11         **2.  August 19, 2012**

12        Mr. Sullivan argues that the officers' presence as they escorted Ms. Brown and

13 Mr. Davis through the Marysville property on August 19, 2012, constituted an

14 unreasonable search in violation of the Fourth Amendment.  (*See* Am. Compl. at 5.2.)

15 Exercising its discretion under *Pearson*, the court will address the second prong of

16 qualified immunity first.  *See James v. Rowlands*, 606 F.3d 646, 652 (9th Cir. 2010).

17 Because the parties raise no genuine issues of material fact, this prong is amenable to

18 determination as a matter of law.  *See Green*, 2014 WL 1876273, at *11.  The court finds

19 that qualified immunity applies because, even after construing all factual disputes in Mr.

20 Sullivan's favor, a reasonable officer could have understood that his actions in this

21 situation met the "special needs" exception to the warrant requirement.

22

1    Although warrantless entries of a home are presumptively unreasonable, an

2   exception to the Fourth Amendment warrant requirement applies when "special needs,

3   beyond the normal need for law enforcement, make the warrant and probable-cause

4   requirement impracticable." *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987).  The special

5   needs doctrine applies "only in exceptional circumstances, and must be analyzed in the

6   context of the specific factual circumstances involved in the case." *Henderson v. City of*

7   *Simi Valley*, 305 F.3d 1052, 1056 (9th Cir. 2002).  Specifically, this exception "applies

8   only where the court determines, first, that specific special needs, beyond the normal

9   need for law enforcement, exist." *Id.* (internal citations omitted).  If such a finding is

10  made, the court must next determine "whether these special needs make the warrant and

11  probable-cause requirement of the Fourth Amendment impracticable in a given context."

12  *Id.* (internal citations omitted).  If both of those criteria are met, a court must "assess the

13  constitutionality of the search by balancing the need to search against the intrusiveness of

14  the search." *Id.* at 1059.

15          **a.  Non-Law Enforcement Function**

16          In determining whether a Fourth Amendment intrusion serves an interest beyond

17  the normal need for law enforcement, the Supreme Court steers courts "toward an

18  analysis of the purpose of the intrusion." *Henderson*, 305 F.3d at 1057.  For example, in

19  *Henderson*, police officers accompanied a minor enforcing a court order permitting her to

20  recover belongings from the house of a family member suspected of domestic violence.

21  *Id.* at 1054-55.  When the family member resisted, the officers arrested her and then

22  entered the house a second time to accompany the minor while she continued to retrieve

ORDER- 15

1    her belongings.  *Id.*  The Ninth Circuit concluded that the officers were engaged outside

2    the ordinary needs of law enforcement because (1) "[k]eeping the peace while a minor

3    child exercises her rights pursuant to a court order is not akin to typical law enforcement

4    functions," (2) "the officers were serving as neutral third parties acting to protect all

5    parties, (3) "the officers did not enter the house to obtain evidence of criminal

6    wrongdoing," (4) the purpose of the statute under which the court order was issued was to

7    prevent domestic violence, and (5) "the government's substantial interests in addressing

8    domestic violence . . . present a special need that may justify departure from the ordinary

9    warrant and probable cause requirements."  *Id.* at 1057.

10          Similarly, on August 19, 2012, Officers Xiong and Jones accompanied Ms. Brown

11   into the Marysville residence in order to keep the peace while she exercised her rights as

12   a personal representative of the estate pursuant to a court order.  Ms. Brown showed the

13   officers the court order appointing her as personal representative of Ms. Davis' estate and

14   authorizing her to "administer and close the estate without further intervention of the

15   court," and explained that she intended to inspect and document the estate.  (*See* Jones

16   Rep. at 44-45; Xiong Dep. at 56-57; Sullivan Dep. at 21; Nonintervention Order ¶ 5.3.)

17   Under Washington state law, Ms. Brown was entitled to immediate possession and

18   control of estate property and was required to settle the estate "as quickly as possible"

19   while ensuring against the "loss or decrease or destruction of any of the property."  RCW

20   11.48.010, 11.48.020, 11.48.030.  Moreover, because she was granted nonintervention

21   powers, she was entitled to take these steps and "in all other respects administer and settle

22   the estate without intervention of court."  RCW 11.68.090.  Although the timing of her

1    arrival was unfortunate, Mr. Sullivan admits that Ms. Davis was not previously informed

2    of when—or if—a service would be held at the property.  (Sullivan Dep. at 13.)  Most

3    importantly, Mr. Sullivan also admits that the officers' presence was necessary to keep

4    the peace between Ms. Brown and the guests attending the service, stating that the

5    officers "had to" escort Ms. Brown and Mr. Davis into the house because:  "There would

6    have been mayhem if they didn't."  (*Id*. at 24.)

7            Furthermore, the officers were serving as neutral third parties acting to protect all

8    parties:  as Mr. Sullivan describes the scene, "My guests basically attacked them.  They

9    were yelling and screaming, and she was yelling and screaming at them . . . ."  (*Id*. at 23-

10   24.)  There is simply no indication—and Mr. Sullivan makes no allegation—that the

11   officers entered the house to obtain evidence of criminal wrongdoing.  *See Henderson*,

12   305 F.3d at 1057.  Moreover, the purpose of the statutes under which Ms. Brown's court

13   order was issued is to ensure efficient administration of estates while conserving court

14   resources.  *See* RCW § 11.96A.070 ("The legislature hereby confirms the long standing

15   public policy of promoting the prompt and efficient resolution of matters involving trusts

16   and estates."); 26B Wash. Prac., Probate Law and Practice § 3.11 ("For a *nonintervention*

17   probate, the statutory objective is to simplify the probate actions and procedures by

18   minimizing Court involvement."); *see generally* RCW 11.48.010; RCW 11.68.090.  As

19   such, the government's substantial interests in ensuring prompt and efficient probate

20   administration present a special need that may justify departure from the ordinary warrant

21   and probable cause requirements.  *See Henderson*, 305 F.3d at 1057.  In sum, even

22   viewing the facts in the light most favorable to Mr. Sullivan, reasonable officers

ORDER- 17

1  presented with those facts could have concluded that intervention was necessitated by

2  special needs beyond the normal need for law enforcement. *See Green*, 2014 WL

3  1876273, at *11.

4  **b.  Impracticability of the Warrant and Probable Cause Requirements**

5  Turning to the second consideration, requiring the officers to obtain a warrant in

6  this situation would not only be impracticable, but would vitiate the purpose of the court

7  order granting Ms. Brown nonintervention power in the first place. *See Henderson*, 305

8  F.3d at 1057-58.  Requiring a warrant would impose delay and implicate court

9  resources—consequences that the Washington State probate code specifically seeks to

10  forestall.  Moreover, it is not clear what assurances imposing a warrant requirement

11  would add:  as a personal representative entitled to immediate possession of the

12  Marysville property, Ms. Brown likely already enjoyed the ability to consent to police

13  presence on the property. *See United States v. Murphy*, 516 F.3d 1117, 1122 (9th Cir.

14  2008) ("It is well established that a person with common authority over property can

15  consent to a search of that property without the permission of the other persons with

16  whom he shares that authority.").  And, even if Ms. Brown did not have the ability to

17  consent to police presence on the Marysville property, "[u]nder the apparent authority

18  doctrine, a search is valid if the government proves that the officers who conducted it

19  reasonably believed that the person from whom they obtained consent had the actual

20  authority to grant that consent." *United States v. Arreguin*, 735 F.3d 1168, 1175 (9th Cir.

21  2013).  For these reasons, the Second Circuit granted qualified immunity to police

22  officers who, acting without a warrant or court order but with the permission of the

1    conservator of an estate, forcibly entered a private residence and removed certain real

2    property over the objections of the occupant.  *See Ehrlich v. Town of Glastonbury*, 348

3    F.3d 48, 60-62 (2d Cir. 2003).  In doing so, the court relied on the scope of rights granted

4    to conservators under state law to conclude that the officers reasonably could have

5    concluded that they were acting with third-party consent.  *Id.*; *see also Wilhelm v. Boggs*,

6    290 F.3d 822, 826 (6th Cir. 2002) (granting qualified immunity to police officers who

7    relied on the consent of an adminstratrix when accompanying her to inventory the estate

8    in question).

9        In the same vein, a probable cause requirement is impracticable, and would not

10   enhance the efficacy of the court nonintervention order.  As the court noted in

11   *Henderson*, probable cause determinations are "peculiarly related to criminal

12   investigations."  Henderson, 305 F.3d at 1059.  As such, "[p]robable cause

13   determinations are peculiarly unsuited to the task of maintaining the peace while

14   effectuating a court order."  *Id.*  In sum, a reasonable officer proceeding under

15   *Henderson*'s guidance could have concluded that applying the warrant and probable

16   cause requirements to the situation on August 19, 2012, was impracticable, and therefore

17   that the special needs exception applied.

18            **c.  Balancing Competing Interests**

19        Upon conclusion that the "special needs" doctrine applies, a court must assess the

20   constitutionality of a police entrance by balancing the need to enter the home against the

21   intrusiveness of the entrance.  *Henderson*, 305 F.3d at 1059.  Whether a particular

22   entrance is reasonable depends on the context within which it takes place.  *Id.*

1    Turning first to Mr. Sullivan's privacy interest, "[t]he sanctity of the home is not

2  to be disputed."  *Id.*  Mr. Sullivan's privacy interest, however, is tempered by the fact that

3  he had notice of Ms. Brown's appointment as a nonintervention personal representative

4  of the estate.  (Sullivan Dep. at 34-37 (discussing copies of the court probate documents

5  that he had made)); *see Henderson*, 305 F.3d at 1059.  Additionally, the Marysville

6  property was titled solely in Ms. Davis' name, and her will bequeathed the property to

7  her children.  (*See* Sullivan Dec. ¶ 5; Will.)  Under Washington state law, when a

8  landowner dies, the title and right to real property instantly vests to her heirs or devisees.

9  RCW 11.04.250; *see also In re Bright*, 241 B.R. 664, 66 (B.A.P. 9th Cir. 1999) ("Under

10  Washington law, property passed under a will is deemed to vest in the beneficiary

11  immediately upon death of the testator.")  Yet Mr. Sullivan continued living on the

12  property.  The Ninth Circuit has made clear that persons with no legal right to occupy

13  land may lack a reasonable expectation of privacy with respect to that land.  *See*

14  *Zimmerman v. Bishop Estate*, 25 F.3d 784, 787-88 (9th Cir. 1994).

15    Second, the government has several patent interests that counterbalance Mr.

16  Sullivan's privacy interest.  *See Henderson*, 305 F.3d at 1059-60.  As discussed above,

17  Washington State has an interest in ensuring prompt and efficient administration of

18  probate proceedings with minimal court intervention.  Moreover, as the Ninth Circuit in

19  *Henderson* recognized, "[t]he state judiciary has an interest in maintaining the integrity of

20  its court orders by ensuring that they are consistently followed."  *Id.* at 1060.  Finally, it

21  is well-established that "the government has a longstanding interest in maintaining peace

22  and general order."  *Id.*

1    Third, the scope of the intrusion was limited.  Mr. Sullivan concedes that the

2    officers' accompaniment of Ms. Brown as she photographed the property lasted only 10

3    minutes.  (Sullivan Dep. at 24.)  The officers played no active role in Ms. Brown's

4    inspection of the property; they merely stood by to prevent a breach of the peace while

5    the court order was implemented.  *See Henderson*, 305 F.3d at 1060.  As such, their

6    actions were "consistent with their function as keepers of the peace."  *Id.* at 1060-61.

7    Furthermore, there is "no evidence in the record that the officers in any way exploited

8    their presence in the residence, or used it as a means of subterfuge."  *Id.* at 1061.  Thus,

9    as in *Henderson*, the "invasion of privacy was not significant."  *See id*.  In short,

10   weighing the relative unobtrusiveness of the search with the other factors, reasonable

11   police officers could conclude that their brief entry onto the Marysville property to keep

12   the peace while Ms. Brown inventoried the estate was reasonable and hence

13   constitutional.

14        This conclusion is buttressed by precedent applying *Henderson* and the special

15   needs exception to similar situations.  For example, in *Long v. Pend Oreille County*, the

16   court found that the special needs exception applied to police officers who accompanied a

17   court-appointed guardian ad litem into a private residence in order to procure, pursuant to

18   a court order, documents implicated in a guardianship proceeding.  *See Long v. Pend*

19   *Oreille Cnty., Sheriff's Dep't*, CV-08-0071-FVS, 2009 WL 604467, at *3 (E.D. Wash.

20   Mar. 9, 2009) *aff'd*, 385 F. App'x 641 (9th Cir. 2010).  The court's ruling hinged on the

21   fact that the officers were "merely engaged in keeping the peace and facilitating the entry

22   into the private residence . . . pursuant to the civil court order."  *Id.*  Balancing the

ORDER- 21

1    interests involved, the court ultimately concluded that the warrantless entry did not

2    violate the Fourth Amendment:  even though the police cut a padlock on the gate to gain

3    access to the property, they "played no active role in the court-authorized inspection and

4    seizure." *Id.* at *4.

5            So, too, here, the officers were merely engaged in keeping the peace and

6    facilitating the entry into the Marysville property pursuant to a court order.  Even taking

7    as true Mr. Sullivan's claims that the officers threatened to arrest him if he prevented Ms.

8    Brown from entering, *Long* makes clear that participation by law enforcement officers to

9    procure court-authorized access to property does not necessarily rise to the level of a

10   Fourth Amendment violation when the special needs exception applies.  In the context

11   Officers Xiong and Jones faced on August 19, 2012, reasonable officers relying on *Long*

12   could have concluded that their conduct was constitutional.

13           Because reasonable officers at the Marysville property on August 19, 2012,

14   proceeding based on *Henderson* and *Long* could have concluded that their actions were

15   reasonable under the special needs exception to the warrant requirement, qualified

16   immunity is appropriate.  *See Green*, 2014 WL 1876273, at *11.

17       **3.  August 20, 2012**

18           Mr. Sullivan also argues that the officers' conduct at the Marysville property on

19   August 20, 2012, constituted an unreasonable seizure in violation of the Fourth

20   Amendment and deprivation of property without of due process of law in violation of the

21   Fourteenth Amendment.  (Am. Compl. at 5.3-5.4.)  Exercising its discretion under

22   *Pearson*, the court will address the second prong of qualified immunity first.  *See James*,

1   606 F.3d at 652.  In the circumstances of this case, the Fourth and Fourteenth

2   Amendment inquiries are, for all relevant purposes, the same.  *See Meyers v. Redwood*

3   *City*, 400 F.3d 765, 770-71 (9th Cir. 2005).  Because it is not clearly established that Mr.

4   Sullivan's alleged loss of property in these circumstances is attributable to state action,

5   the court finds that the officers are entitled to qualified immunity.[5]

6          A violation of § 1983 occurs "when a person, acting under color of the power

7   vested in him as a government officer, proximately causes a citizen of the United States

8   to be deprived of any rights, privileges, or immunities secured by the Constitution or

9   laws."  *Harris v. City of Roseburg*, 664 F.2d 1121, 1125 (9th Cir. 1981).  Two questions

10  are therefore presented: "(1) was the plaintiff deprived of a right, privilege or immunity

11  secured by the Constitution or laws of the United States, and if so, (2) was the deprivation

12  caused by the defendants while they were acting under color of state law?"  *Harris v. City*

13  *of Roseburg*, 664 F.2d 1121, 1125 (9th Cir. 1981).

14         Mr. Sullivan's argument for state action relies primarily on *Harris v. City of*

15  *Rosenberg* and its progeny.  (*See generally* Resp.)  In *Harris*, a police officer, at the

16  request of a creditor, accompanied the creditor during an attempt to repossess a tractor.

17  *Harris*, 664 F.2d at 1124.  When the debtor resisted, the officer intervened, physically

18  interposed himself between the debtor and the tractor, and threatened to take the debtor

19  "straight to jail" if he resisted the repossession any further.  *Id.*  The court denied the

20

21         [5] Mr. Sullivan's briefing relies heavily on deposition testimony by Officer Xiong, Officer Jones,
    and other Marysville police officers as to whether they believed, at the time and later, that Ms. Brown had
    a right to remove items from the Marysville residence.  (*See generally* Resp.)  However, because qualified

22  immunity is an objective inquiry, the officer's subjective beliefs regarding their actions are irrelevant.
    *Torres*, 548 F.3d at 1211.

ORDER- 23

1    officer's motion for summary judgment, holding that "there may be a deprivation within

2    the meaning of § 1983 not only when there has been an actual 'taking' of property by a

3    police officer, but also when the officer assists in effectuating a repossession over the

4    objection of a debtor or so intimidates a debtor as to cause him to refrain from exercising

5    his legal right to resist a repossession." *Id.* at 1127.  Although "mere acquiescence by the

6    police to "stand by in case of trouble" is insufficient to convert a repossession into state

7    action, police intervention and aid in the repossession does constitute state action." *Id.* at

8    1127.  Mr. Sullivan argues that it is clearly established that the officers' alleged threat to

9    arrest Mr. Sullivan if he did not permit Ms. Brown to retrieve items from the house falls

10   within the purview of *Harris* and later cases interpreting *Harris*.  (*See generally* Resp.)

11          Those cases, however, do not control.  Those cases concern self-help repossession

12   or self-help eviction efforts by private citizens.  *See, e.g.*, *Harris*, 664 F.2d at 1124;

13   *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 57 (1992) (self-help eviction); *Howerton v.*

14   *Gabica*, 708 F.2d 380, 381 (9th Cir. 1983) (self-help eviction).  None of those cases

15   involve a facially valid court order authorizing the private citizen's actions.  Here, Ms.

16   Brown had received and showed Officers Xiong and Jones a Snohomish County Superior

17   Court order granting her the ability to immediately possess and administer the estate

18   without the need for further court intervention.  (Jones Rep. at 45; Sullivan Dep. at 28-29;

19   Nonintervention Order.)  Mr. Sullivan does not dispute that *some* of the property

20   removed on August 20, 2012, did in fact belong to the estate.  (*See* Nemeth Dep. at 102;

21   Sullivan Dep. at 63-65.)  Although a debtor possesses a legal right to resist a self-help

22

1  repossession, *see Harris*, 664 F.2d at 1126-27, Mr. Sullivan identifies no legal precedent

2  providing a co-tenant the right to resist possession of property belonging to the estate.

3  As such, *Harris* and its progeny do not directly bear on the situation that the officers

4  faced at the Marysville property on August 20, 2012.

5      *Harris* aside, Mr. Sullivan fails to show that the police officers' effort to enforce

6  the court order by threatening arrest "shocks the conscience" or otherwise rises to the

7  level of a due process violation. *See Corales v. Bennett*, 567 F.3d 554, 568 (9th Cir.

8  2009); *Brittain v. Hansen*, 451 F.3d 982, 996 (9th Cir. 2006) ("[D]ue process secures

9  individuals from "arbitrary" government action that rises to the level of "egregious

10 conduct," not from reasonable, though possibly erroneous, legal interpretation."). To the

11 contrary, in *Myers*, the Ninth Circuit found that an officer's threat to arrest a debtor who

12 had assaulted a repossession agent if she did not acquiesce to the repossession did not

13 violate the debtor's Due Process or Fourth Amendment rights. *Meyers v. Redwood City*,

14 400 F.3d 765, 773 (9th Cir. 2005). Similarly, in *Brittain*, the Ninth Circuit held that an

15 officer who had probable cause to believe that plaintiff was engaged in a felony did not

16 violate due process when he threatened arrest in order to enforce a state court order. *See*

17 451 F.3d at 996. Similarly, here, after being presented with a facially valid will and court

18 order permitting immediate possession of the estate, a reasonable officer could have

19 concluded that Mr. Sullivan's insistence on keeping the estate's property gave rise to

20 probable cause to arrest Mr. Sullivan for theft or perhaps trespass. *See* RCW 9A.56.020

21 (defining theft); RCW 9A.52.080 (defining trespass). As the Ninth Circuit recognized in

22 *Myers*, presenting plaintiff with a choice between two unpleasant consequences—comply

1   with a court order or face arrest—does not violate her Due Process or Fourth Amendment

2   rights.  *Myers*, 400 F.3d at 773.

3       At bottom, then, Mr. Sullivan's claim turns on the extent to which the court order

4   authorized Ms. Brown's and Mr. Sullivan's actions—that is, the extent to which the

5   officers were involved with the removal of items that actually belonged to Mr. Sullivan.[6]

6   The court concludes that the officers are entitled to qualified immunity in this context

7   because it is not clearly established whether the officers became "so enmeshed in

8   effectuating the [removal] that the deprivation and seizure . . . [was] attributable to the

9   state."  *See Meyers*, 400 F.3d at 771.

10      To begin, as in *Myers*, and in contrast to the situation in *Harris*, Officers Ziong

11  and Jones "were summoned to a scene not of their making."  *Id.* at 772.  They were not

12  alerted in advance to Ms. Brown's attempt to retrieve items from the Marysville property

13  and asked to "stand by" in case of resistance.  *See Harris*, 664 F.2d at 1124.  Rather, they

14  responded to Mr. Sullivan's 911 call for assistance, and arrived at an ongoing fracas that

15  they were expected to diffuse.  (*See* Sullivan Dep. at 27-30; Jones Rep. at 45; Nemeth

16  Dep. at 100.)  Accordingly, they attempted to broker a compromise.  (*See* Sullivan Dep at

17  ───────────────

18      [6] It does not appear that Mr. Sullivan has put forth any direct evidence identifying specific items of his property that were removed and not returned.  (*See generally* Needle Decl. Exs. A-G.)  The court is "not required to comb the record to find some reason to deny a motion for summary judgment."  *Forsberg*

19  *v. Pacific N.W. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988).  The court must, however, "draw all reasonable inferences in favor of the nonmoving party."  *Reeves*, 530 U.S. at 150.  Because Mr. Sullivan

20  testifies that he brought many of his possessions with him when he moved from Rhode Island to Washington (Sullivan Dep. at 60-63), Ms. Nemeth testified that Ms. Brown and Mr. Davis removed numerous items from the Marysville property (Nemeth Dep. II at 77), and Ms. Nemeth testified that Mr.

21  Sullivan disputed the ownership of at least one item on August 20, 2012 (*id.*), the court believes it is reasonable to infer that at least one item of Mr. Sullivan's property was removed on August 20, 2012, and

22  not returned.

1    32-33; Jones Rep. at 35.)  This sequence of events militates against a finding that the

2    officers took the "active role" in Ms. Brown's removal of items necessary to justify a

3    finding of state action.  *See Fournier v. Cuddeford*, 3:11-CV-00343-AC, 2012 WL

4    5921142 (D. Or. Nov. 26, 2012) *aff'd*, 12-36062, 2014 WL 2038245 (9th Cir. May 19,

5    2014) (finding no state action where an officer summoned to an ongoing altercation

6    threatened an evicted tenant with arrest because the officer "did not create or contribute

7    to the events that resulted either in Plaintiff's removal from the house or being prevented

8    from reentering it," but rather "was faced with competing accounts of the confrontation

9    and, based on that information, took no action on behalf of either side but instead told

10   each side their options.")

11            Moreover, critically absent from Mr. Sullivan's theory is any indication that the

12   officers were involved in the determination of what property was and was not removed

13   from the Marysville residence on August 20, 2012.  Faced with a facially valid court

14   order permitting Ms. Brown to retrieve items from the Marysville property, the officers

15   did their best to effectuate the order.  After the parties reached the compromise, the

16   officers left the parties to work out the remainder of the civil dispute between themselves.

17   (*See* Nemeth Dep. at 101-02; Jones Rep. at 47; Police Rep. at 33; Davis Dep. at 168-73.)

18   Although the parties requested that the officers remain to adjudicate which items could be

19   removed and which must stay, (*see* Nemeth Dep. at 101-02), by all accounts, the officers

20   declined and left.  (*See id.*; Jones Rep. at 47; Police Rep. at 33; Davis Dep. at 168-73.)

21   Mr. Sullivan identifies no legal precedent suggesting that the officers should be held

22   liable for alleged deprivations of property that occurred after they left the scene.  Mr.

1    Sullivan has not shown that a reasonable officer would have understood that permitting

2    Ms. Brown to access the property but then declining to arbitrate the parties' dispute

3    regarding the removal of items rises to the level of a constitutional violation.[7]  *See*

4    *Fournier*, 2012 WL 5921142, at *9-12 (finding no state action because the alleged

5    deprivation of property did not occur under the police officer's purview, but rather was

6    completed before they arrived on the scene).  As such, qualified immunity is appropriate.

7            In so holding, the court does not express any view on whether the officers' actions

8    on August 20, 2012, were constitutional.  This area of the law is particularly fact-

9    sensitive and "complicated."  *Meyers*, 400 F.3d at 770.  The officers were required to

10   make a close decision in the midst of an emotionally charged dispute, and cannot be

11   faulted for attempting to settle this confrontation peacefully.  *See id.* at 774.  The officers

12   may or may not have been mistaken in believing that their actions to enforce the

13   nonintervention court order were justified, but they were not "plainly incompetent."

14   *Malley*, 475 U.S. at 341.  Accordingly, they are entitled to qualified immunity.  *See*

15   *Stanton v. Sims*, 134 S. Ct. at 7.

16

17

18

19   _____

20          [7] Mr. Sullivan testified in his deposition that Ms. Brown and Mr. Davis arrived at the property at
     9:00 a.m. on August 20, 2012, but the computer aided dispatch reports show that Mr. Sullivan first called
     the police at 4:24 p.m.  (*See* Sullivan Dep. at 27; Police Rep. at 32-33.)  The distinction is immaterial for

21   purposes of this determining the officers' liability.  Mr. Sullivan does not claim that Mr. Davis entered the
     property or began removing items before he called the police.  (*See* Sullivan Dep. 27-34.)  Even if he had,
     *Fournier* makes clear that there is no state action for alleged deprivations of property that occur before

22   police arrive on the scene.  *See* 2012 WL 5921142, at *9-12.

ORDER- 28

1    **D.    State Law Claims**

2        Turning to Mr. Sullivan's claims under Washington state law for invasion of

3    privacy and conversion, the court finds that the officers and Marysville are entitled to

4    summary judgment on both claims.

5        **1.   Invasion of Privacy**

6         "Under Washington state law, "[o]ne who intentionally intrudes, physically or

7    otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is

8    subject to liability to the other for invasion of his privacy, if the intrusion would be highly

9    offensive to a reasonable person." *Mark v. Seattle Times*, 635 P.2d 1081, 1094 (1981)

10   (quoting Restatement (Second) of Torts § 652B at 378 (1977); *see also Reid v. Pierce*

11   *County*, 961 P.2d 333, 338 (Wash. 1998).  The interference with a plaintiff's seclusion

12   "must be a substantial one resulting from conduct of a kind that would be offensive and

13   objectionable to the ordinary person." *Mark*, 635 P.2d at 1094.

14       Mr. Sullivan argues that the presence of Officers Xiong and Jones in the

15   Marysville residence on October 19, 2012, constitutes an invasion of his privacy.  As

16   personal representative of the estate, however, Ms. Brown was entitled to immediate

17   possession of and control over the residence.  *See* RCW 11.48.020; *In re Estate of Jones*,

18   93 P.3d at 153-54.  Consequently, she was entitled to consent to police presence at the

19   residence.  Moreover, it is generally accepted that the rights and duties of the personal

20   representative include the duty to inventory the estate.  *See* 26B Wash. Prac., Probate

21   Law and Practice § 3.36; *see generally* RCW 11.48.010; RCW 11.48.030.  Mr. Sullivan

22   identifies no legal precedent supporting his contention that taking inventory of a

1    decedent's shared residence amounts to an invasion of privacy of the remaining co-

2    tenant—especially when the residence belongs to the estate.  Indeed, such a holding

3    would unnecessarily impede—and subject to personal liability—personal representatives

4    attempting to execute their duty to settle the estate "as rapidly and as quickly as

5    possible." *See* RCW 11.48.010.

6         All of the evidence before the court shows that the officers did nothing more than

7    escort Ms. Brown as she photographed the residence.  (*See, e.g.*, Sullivan Dep. at 20-25.)

8    Mr. Sullivan supplies no evidence establishing that this 10-minute survey was a

9    substantial intrusion into his seclusion "resulting from conduct of a kind that would be

10   offensive and objectionable to the ordinary person." *See Demelash*, 20 P.3d at 455.

11   Because Mr. Sullivan has not "set forth specific facts showing that there is a genuine

12   issue for trial" from which a factfinder could reasonably find the officers or Marysville

13   liable for invasion of privacy, summary judgment is appropriate on this claim.  *See*

14   *Anderson*, 477 U.S. at 252.

15        **2.  Conversion**

16        "A defendant is liable for conversion if he willfully and without legal justification

17   deprives another of ownership of his property." *Demelash v. Ross Stores, Inc.*, 20 P.3d

18   447, 455 (2001).  Mr. Sullivan's conversion claim fails for the same reason as his

19   unreasonable seizure and due process claims:  there is no evidence that any Marysville

20   police officers willfully interfered with any of Mr. Sullivan's property.  To the contrary,

21   as discussed above, the alleged removal of Mr. Sullivan's property by Ms. Brown and

22   Mr. Davis occurred after Officers Xiong and Jones arrived at and then left the Marysville

1    residence on August 20, 2012.  Mr. Sullivan does not contend that the officers personally

2    removed or kept any of Mr. Sullivan's property.  And he puts forth no facts or legal

3    argument showing why the officers should be held liable for Ms. Brown's and Mr. Davis'

4    subsequent actions to remove Mr. Sullivan's property.

5         Similarly, by the time Marysville police officers arrived at the scene on January

6    22, 2013, Ms. Brown and Mr. Davis had already locked Mr. Sullivan out of the

7    Marysville residence.  (*See* Sullivan Dep. at 47-53; Lutschg Dep. at 148-51; Vermeulen

8    Dep. at 160-63).  Marysville police officers played no part in Ms. Brown's attempt to

9    evict Mr. Sullivan.  They did not prevent Mr. Sullivan from trying to re-enter the

10   property; at most, they merely put him on notice that if he caused a disturbance, he risked

11   arrest.  (*See* Sullivan Dep. at 52; Lutschg Dep. at 148-51; Vermeulen Dep. at 160-63).

12   Mr. Sullivan's main complaint seems to be that the police did not take affirmative action

13   to reinstate Mr. Sullivan into residence on the property.  (*See* Sullivan Dep. at 51-52.)

14   But Mr. Sullivan identifies no legal precedent explaining why the officers' refusal to

15   forcibly oust Ms. Brown from the property constitutes conversion.  This is especially true

16   because it is not clear that Mr. Sullivan possessed any ownership interest in the property

17   at all:  after all, he does not dispute that the property was titled in Ms. Davis' name only,

18   and was bequeathed in her will to her children—not to him.

19        In short, Mr. Sullivan puts forth no facts establishing the "willful interference"

20   element of conversion.  *See Demelash*, 20 P.3d at 455.  Because Mr. Sullivan has not "set

21   forth specific facts showing that there is a genuine issue for trial" from which a factfinder

22

ORDER- 31

1    could reasonably find the officers or Marysville liable for conversion, summary judgment

2    is appropriate on this claim.  *See Anderson*, 477 U.S. at 252.

3                      **IV.    CONCLUSION**

4         For the foregoing reasons, the court GRANTS Defendants' motion for qualified

5    immunity and summary judgment (Dkt. # 46).

6         Dated this 9th day of June, 2014.

7

8                                     _____

9                                    JAMES L. ROBART
                                   United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 32